IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JANNIE LEE KING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:14-CV-2047-BH |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated August 22, 2014, this case has been transferred for the conduct of all further proceedings and the entry of judgment. (doc. 15.)  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND[1]

### A.    Procedural History

Jannie Lee King (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (R. at 22-31.) On December 8, 2011, Plaintiff applied for a period of disability and DIB, alleging disability beginning on April 26, 2011. (R. at 22.) Her application was initially denied on February 8, 2012, and upon reconsideration on March 27, 2012. (R. at 63-67, 71-74.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ)

---

[1]   The background information is summarized from the record of the administrative proceeding, which is designated as "R."

on April 6, 2012, and subsequently appeared and testified at a hearing held on January 9, 2013. (R. 36–57, 87-103.) On February 26, 2013, the ALJ issued his decision finding Plaintiff not disabled. (R. at 19–35.) The Appeals Council denied her request for review on April 10, 2014, making the ALJ's decision the final decision of the Commissioner. (R. at 1–7.) Plaintiff timely appealed the Commissioner's decision pursuant to Title 42 U.S.C. § 405(g). (doc. 1.)

**B.    Factual History**

      **1.    Age, Education, and Work Experience**

Plaintiff was born in 1964. (R. at 40.) At the time of the hearing before the ALJ, she was 48 years old, had completed school through the twelfth grade, and had no other educational or vocational training after school. (R. at 40-41.) She had past relevant work experience from 1992 to 2011 as a cook, a seamstress, and an assembler. (R. at 30.)

      **2.    Medical Evidence**

On July 23, 2010, Plaintiff went to Huguley Memorial Medical Center and was examined by Nabil K. Aboukhair, M.D. (R. at 255-57.) Dr. Aboukhair found Plaintiff had minimal cervicitis, nabothian cysts on her cervix, and proliferative and basalis endometrium of her uterus. (R. at 255.) He diagnosed her with metrorrhagia. (R. at 257.)

On October 31, 2010, Plaintiff presented to the emergency room at Texas Health Fort Worth, where she was treated by Ralph Baine, M.D., for tailbone pain. (R. at 260.) She reported tripping in her Halloween costume, landing on her tailbone, and subsequently having pain. (*Id*.) Plaintiff also noted a history of restless leg syndrome. (*Id*.) She rated her pain as an eight out of ten, and it was exacerbated by movement and touch. (*Id*.) On examination, the mobility of her coccyx was consistent with a fracture. (R. at 261.) Dr. Baine also noted that Plaintiff had sacrum tenderness to

palpation.[2] (*Id.*) He diagnosed a fracture of the coccyx and instructed Plaintiff to use a "donut" cushion for as long as she had pain in her coccyx and to take Hydrocodone-Acetaminophen (Vicodin) as prescribed. (*Id.*) Dr. Baine also instructed Plaintiff to follow-up with her primary care physician within one week. (*Id.*)

On March 8, 2011, Plaintiff went to the emergency department at Huguley Memorial Medical Center for severe back pain. (R. at 200-02.) She was examined by Bobby Johnson, D.O. (*Id.*) Plaintiff reported that she hurt her back 6-7 months before, and her pain had recently worsened. (*Id.*) She rated her pain as a nine out of ten in severity, with associated numbness and weakness in her legs. (R. at 201.) Dr. Johnson found tenderness in her lower back and decreased sensation in her bilateral lower extremities. (R. at 202.) According to an emergency room assessment by Linda McLaughlin, R.N., Plaintiff had a steady gait. (R. at 236.) Dr. Johnson diagnosed Plaintiff with degenerative disc disease and prescribed Cyclobenzaprine (Flexeril) and Lortab. (R. at 202, 217, 221, 236.) Dr. Johnson directed Plaintiff to have an MRI and lab tests. (R. at 203, 207.)

On the same date, an MRI revealed facet anthropathy with mild hypertrophy of ligamentum flavum at LI-L2 and L2-L3. (R. at 227-28.) At L3-L4, Plaintiff exhibited a broad-based disc bulge with small central disc protrusion, and she also had a mild bilateral neural foraminal narrowing and facet anthropathy with hypertrophy of ligamentum flavum. (R. at 228.) At L4-L5, she exhibited a broad-based disc bulge, an increased T2 signal along the posterior margin of the disc suggesting an annular tear, facet anthropathy with hypertrophy of ligamentum flavum, and mild bilateral neural

---

[2] The most thorough finding on examination is usually the local tenderness upon palpation of the coccyx. If the coccyx is not tender to palpation, then the pain in the region is referred from another structure, such as a lumbosacral disc herniation or degenerative disc disease.

foraminal narrowing. (*Id.*) Ray S. Butler, M.D., interpreted the MRI and opined that Plaintiff suffered from "[m]ild multilevel degenerative disc disease and facet anthropathy without central canal stenosis. . . . [with] mild neural foraminal narrowing noted at multiple levels as described above." (*Id.*)

On March 30, 2011, Plaintiff presented to the emergency room at Texas Health Fort Worth, where she was treated by Karim Jamal, M.D. (R. at 362.) Plaintiff reported chronic back pain over the last year that had worsened after a work incident where she was "hammering on something." (*Id.*) Dr. Jamal found tenderness in her lumbar region. (R. at 264.) He diagnosed Plaintiff with back pain and prescribed Metaxalone (Skeloxin). (R. at 265.)

On April 11, 2011, Plaintiff saw George F. Cravens, M.D., at the Center for Neurological Disorders in Fort Worth for a neurological evaluation due to her year-long history of low back pain. (R. at 320-21.) Plaintiff indicated that in the previous three to four weeks, her pain had become "even more debilitating." (R. at 320.) She described the pain as mostly in her low back and the left side of the low back through the hip. (*Id.*) Plaintiff indicated that she had pain radiating down both of her legs—the left worse than the right—and that her legs went numb periodically while standing or walking. (*Id.*) She also had a significant amount of discomfort when sitting, and Medrol Dosepak did not relieve her symptoms. (*Id.*) Her medications included Clonazepam, Meloxicam, Neurontin, and Hydrocodone. (*Id.*) Dr. Cravens noted the findings from Plaintiff's March 8, 2011 MRI and planned for her to undergo a CT myelogram of her lumbar spine and an EMG of her lower extremities to evaluate whether surgical options were appropriate. (R. at 321.)

On April 14, 2011, Plaintiff saw Robert K. Bressler, M.D., for a lumbar myelogram and CT. (R. at 278-81.) The lumbar myelogram revealed "moderate degenerative space narrowing at L5-S1

4

with anterior osteophyte formation." (R. at 278.)  The CT report revealed mild right facet arthrosis without central canal or neutral foraminal narrowing at L3-L4, and mild bilateral facet arthrosis at L4-L5. (R. at 280.) At L5-S1, there was a "[d]iffuse disc bulge measuring 4 mm approximately at the midline" and a lower endplate osteophyte formation at L5 that was more prominent on the left, where it caused mild neural foraminal narrowing. (*Id*.)

On May 5, 2011, Plaintiff met with Dr. Craven. (R. at 331-32.)  Dr. Craven and Plaintiff discussed the physical findings, results of her studies, and treatment options. (R. at 332.)  Plaintiff stated that she was not interested in "conservative treatment." (*Id*.)  Plaintiff decided to proceed with a lumbar myelogram with post CT myelogram. (*Id*.)

On May 7, 2011, Plaintiff saw Dr. Cravens, and he evaluated the myelogram CT report.  (R. at 319.)  He recommended Plaintiff undergo "left semihemilaminectomy, medial facetectomy, foraminotomy, and discectomy with removal of ostephyte at L5-S1 with posterolateral onlay graft." (*Id*.)  On May 17, 2011, Dr. Cravens performed these procedures as well as a "nerve root stimulation L5 and S1 nerve roots on the left, with response of 1-2 vM following decompression." (R. at 26, 325-327.)  Dr. Cravens reported no abnormalities and Plaintiff tolerated the operation well. (R. at 327.)  Rebecca A. Mantsch, D.O., reviewed the samples taken by Dr. Craven and diagnosed a herniated lumbar disc. (R. at 266-67.)   Dr. Mantsch also noted Plaintiff had degenerative fibrocartilage and undecalcified bone.  (R. at 266.)

On June 17, 2011, Plaintiff saw Dr. Cravens for a post-operative checkup, and he recommended physical therapy for strengthening and reconditioning until another checkup in two or three months. (R. at 318.)  Plaintiff's medications included Hydrocodone, Diazepam, and Meloxicam. (*Id*.) On July 18, 2011, Dr. Cravens prescribed physical therapy, including heat and cold

modalities, ultrasound, massage, and stretching and flexibility exercise to the lumbar surgery area, three times per week for six weeks. (R. at 286.)

On July 19, 2011, Plaintiff began physical therapy at Green Oaks Orthopedic Spine and Sports (Green Oaks) with Charles Martin, P.T., per Dr. Cravens's referral. (R. at 288.) She reported moderate pain and was wearing a back brace for stabilization of her back. (*Id.*) Under Green Oaks's "objective measurements," Plaintiff's resting pain was rated four out of ten, and her exertional pain was rated six out of ten—with pain increased when sitting to standing and with any type of spine mobility. (*Id.*) She exhibited minimal to moderate limitation with bilateral hip rotation, and she had some tightness in that region as well. (*Id.*) Her L4 was graded as only 3/5 in strength due to pain and apparent myotomal weakness. (*Id.*) Her gait indicated moderate guarding secondary to pain. (*Id.*) Plaintiff was treated in physical therapy on at least twenty occasions without missing a single treatment through September 13, 2011. (R. at 291-312.)

On August 8, 2011, Plaintiff was treated by Dr. Cravens, who indicated that Plaintiff was going on three months out from her lumbar laminectomy with onlay fusion and had reported to him that her pain was 80% better than prior to surgery. (R. at 316.) Plaintiff stated that the leg pain she had before the surgery was better, although she still had pain in her back that radiated into her left buttock. (*Id.*) Dr. Cravens released her back to work with restrictions—such as no lifting over 15 pounds, no bending, no stooping—and with frequent rest breaks. (*Id.*) He stated that Plaintiff was not able to work full duty in relation to her most recent job. (*Id.*)

On September 19, 2011, Plaintiff saw Dr. Cravens and reported a lot of pain in her hip, mostly on her left-back side. (R. at 314-15.) Dr. Cravens believed that the pain was coming from her SI joints and noted that he would initially place her on a Medrol Dosepak. (*Id.*) He wanted

Plaintiff to use a transcutaneous electrical nerve stimulation (TENS) unit, and instructed her to return to the clinic once her injections were completed. (*Id.*)

On February 10, 2012, non-examining State agency review physician Rajat Gupta, M.D., found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for at least two hours in an eight hour workday, sit about six hours in an eight hour workday with periodic alterations between sitting and standing to relieve pain or discomfort, and that she could sit no more than one hour without a break due to her coccyx fracture. (R. at 338.) Dr. Gupta also opined that Plaintiff could occasionally perform all postural limitations, except that she could never climb a ladder, rope, or scaffolds. (R. at 339.)

On February 14, 2012, Plaintiff was admitted to the emergency room at Texas Health Cleburne, where she was examined by Ryschelle Renee Bolton, D.O., and diagnosed with left side abdominal pain. (R. at 346-55.) Plaintiff reported that her abdominal pain had occurred for the past 6-7 months, and that the pain occurred generally once a week and lasts for approximately one hour. (*Id.*) She described the pain as "a knife . . . stabbing her" or "giving birth." (R. at 348.) Plaintiff reported that she had experienced three of these episodes the day before going to the emergency room, and that she had experienced a persisted pain throughout the day two days before going to the emergency room. (*Id.*) She reported her pain as 5/10. (*Id.*) She was diagnosed with an acute pelvic pain and told to follow-up with her OB/GYN within a day. (R. at 351-52.)

On March 12, 2012, Plaintiff underwent an MRI of her lumbar spine at Dr. Cravens' request. (R. at 359.) At L4-L5, there was posterior bulging of the annulus with mild facet hypertrophy and an annular tear. (*Id.*) At L5-S1, she had a circumferential disc bulging with anterior traction spurs and foraminal narrowing that was mild to moderate on the left and minor on the right. (*Id.*)

On March 23, 2012, Plaintiff saw Dr. Cravens for a neurosurgical follow-up. (R. at 357.) She reported that the pain she had prior to her surgery had resolved, but she had pretty constant back pain that radiated to her hips. (*Id.*) Her pain worsened with activity, and she was unable to complete any daily activities or work due to pain, requiring pain medication and help with household chores from her family members. (*Id.*) Plaintiff complained of restless leg-type symptoms, and Dr. Cravens prescribed Neurontin. (*Id.*) He wanted Plaintiff to do therapy or injections but noted she could not afford the treatment. (*Id.*) Dr. Cravens provided Plaintiff with an exercise booklet with exercises she could do on her own. (R. at 358.) He noted that Plaintiff was unable to work due to the amount of pain she had. (*Id.*)

On March 23, 2012, James Wright, M.D. reviewed all of the evidence in Plaintiff's file and Dr. Gupta's RFC assessment dated February 10, 2012. (R. at 261.)   He affirmed Dr. Gupta's assessment as written. (*Id.*)

On March 26, 2012, Dr. Cravens completed an RFC questionnaire outlining Plaintiff's limitations resulting from her lumbar degenerative disc disease and her lumbar pain. (R. at 363-64.) He listed constant low back pain and bilateral hip pain as symptoms. (*Id.*) He opined that Plaintiff would need to recline or lie down during a hypothetical eight hour workday in excess of the typical fifteen minute break in the morning, thirty to sixty minute lunch, and the typical fifteen minute break in the afternoon. (*Id.*) He thought her symptoms would constantly be severe enough to interfere with the amount of attention and concentration required to perform simple work-related tasks. (*Id.*)  Dr. Cravens opined Plaintiff had the following limitations resulting from her impairments:

1.    she could not walk a city block without rest or significant pain;
2.    she could sit for fifteen minutes at one time and a total of three hours in an eight hour work day;
3.    she could stand/walk a total of fifteen minutes at one time and stand/walk a total of

8

two hours in an eight hour workday;

4.    she would need a job permitting shifting positions at will from sitting, standing, or walking;

5.    she would need unscheduled breaks during an eight hour workday every one to two hours lasting fifteen to twenty minutes each in duration;

6.    she could occasionally lift ten pounds but never twenty;

7.    she could use her right and left hands to grasp, turn, or twist objects fifty percent of the day; she can use her right or left arm for reaching fifty percent of the day;

8.    she was not a malingerer; she would not miss work more than four times a month as a result of treatments or impairments;

9.    and she was not physically capable of working an eight hour day, five days a week on a sustained basis.

(R. at 364.)

On June 7, 2012, another non-examining State agency review physician, Alicia V. Blando, M.D., completed an RFC assessment. (R. at 371-75.) Dr. Blando found that Plaintiff's ability to lift only ten pounds was not fully supported by the entirety of the file. (R. at 374.) She opined Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand/walk about six hours in an eight hour workday, sit about six hours in an eight hour work day, and perform occasionally all postural activities. (R. at 372.) Dr. Blando found that Plaintiff's manipulative limitations were not supported by the file, and noted that the fact Plaintiff did not mention bilateral hip pain to her physical therapist on her last visit—but did mention it to Dr. Cravens—was reason to disagree with Dr. Cravens's assessment. (R. at 374.) Dr. Blando then noted "[a] light RFC s not unreasonable with the usual breaks and lunch periods." (*Id.*)

On June 22, 2012, Plaintiff had a follow-up with Dr. Cravens. (R. at 377.)  She complained of bilateral hip pain and back pain, with pain radiating from her right hip down into her right leg. (*Id.*)  Plaintiff had stopped taking Neurontin, as it did not relieve any of her symptoms or pain. (*Id.*) Dr. Cravens noted that Plaintiff was only taking Bayer Aspirin or Aleve. (*Id.*)  He recommended a CT myelogram or bilateral lower extremity EMG testing, but noted that Plaintiff could not afford

his recommended options. (*Id.*)

### 3.     Hearing Testimony

On January 9, 2013, Plaintiff and a Vocational Expert (VE) testified at a hearing before the

ALJ. (R. at 38.)  Plaintiff was represented by an attorney at the hearing. (*Id.*)

#### a.     *Plaintiff's Testimony*

Plaintiff testified that she was born on March 31, 1964, 48 years old, and completed the

twelfth grade. (R. at 40-41.) She had been married to her husband for thirty years, and they resided

in a house together. (R. at 41.) She was  5'2" and weighed about 130 pounds, but her normal weight

was between 115 and 120 pounds. (R. at 41-42.) She had not worked full-time or part-time since

April 2011, before her surgery. (R. at 42.)

Plaintiff last worked as a seamstress for Bell Helicopter. (*Id.*) She left that job because her

legs were going numb, she had spurs in her back, and she had collapsed twice. (*Id.*) She did not work

because the muscles in her back hurt all day, and on some days her muscles did not want to move.

(R. at 43.) Her back pain came from her lower back, and she rated it as an eight on a scale of one

to ten. (*Id.*) She had not been prescribed any pain medication and did not take any other pain

medication other than Tylenol. (*Id.*) Plaintiff had difficulty standing and walking, and could only

sit for thirty minutes before she had to do something else. (R. at 45.) She could not stand for more

than an hour and could maybe walk one block. (*Id.*) Plaintiff did exercises as therapy to stretch the

muscles in her back, but she got up twice a night because she was still hurting. (R. at 47.) She got

relief by lying down, and she laid down five hours per day. (*Id.*)

Prior to her job with Bell Helicopter, Plaintiff had worked on the assembly line for

RangeAire Vent-a-Hoods and for sixteen years as the cafeteria manager at Alvarado Independent

School District. (R. at 52.)

After leaving Bell Helicopter, Plaintiff watched television five to six hours a day. (R. at 43-44.) She was not capable of doing any yard work or much housework. (R. at 44-45.) Plaintiff tried to sweep the floors in the living room and kitchen once a week but relied solely on her husband to do most of the sweeping, mopping, and vacuuming.  (R. at 46.) On a good day, she could do a couple of loads of laundry. (*Id.*) Her husband did all of the cooking. (*Id.*) He also did all of the driving because her hands and arms would shake due to pain in her nerves. (*Id.*) Plaintiff used her cellphone once or twice a week to text her son and did not use email. (R. at 47.) She did not own or use a computer. (R. at 44.)  Plaintiff did not read books, magazines, or newspapers, but she did crochet as a hobby. (*Id.*)

Prior to her surgery in May 2011, Plaintiff was taking Clonazepam, Meloxicam, Neurontin, and Hydrocodone. (R. at 48.) She did not take those medications anymore because she lost her insurance one month after her surgery. (*Id.*) She usually went to the grocery store with her mother and had to use the motorized buggy because she was usually hurting. (*Id.*) Plaintiff had trouble doing daily activities due to her pain. (R. at 50.) It was difficult for her to put on her socks and pants, and to clean, cook, or drive. (*Id.*) Driving was problematic because braking jarred her back and caused more pain. (R. at 51.)

### b.      *Vocational Expert Testimony*

The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and work experience could perform work with the following limitations: lift and carry occasionally  ten pounds; lift and carry frequently no more than ten pounds; stand and walk about six hours in an eight hour day and sit about six hours in an eight hour day, with the ability to alternate sitting or standing

at will to relieve pain or discomfort and have a push/pull limitation of 20 pounds in the upper extremities with no climbing of scaffolds, ropes, or ladders; occasionally ramps and stairs; occasional balancing, kneeling, crouching, crawling, and stooping; constant reaching, handling, fingering, and feeling; no visual or communication limitations; no work around hazardous moving machinery, excessive vibration, or unprotected heights. (R. at 54.)

The ALJ then asked the VE whether the hypothetical person could perform Plaintiff's past relevant work. (R. at 55.)  The VE opined that the hypothetical person could not perform Plaintiff's past relevant work, but could perform work as a callout operator (237.367-014, sedentary, SVP:2), a document preparer (249.587-018, sedentary, SVP:2), and a reduced number of final assembler jobs. (736.381-010, sedentary, SVP:2). (*Id.*) The VE identified a reduced number of final assembler jobs to allow for the hypothetical person's sit/stand requirements. (*Id.*)  He also testified that for SVP:2 jobs, there was an assumption that the individual would be required to work about eight hours a days and 40 hours a week. (*Id.*)

The ALJ asked the VE if his testimony conformed with the Dictionary of Occupational Titles (DOT). (*Id.*)  The VE stated that his testimony did conform to the DOT but that the DOT was silent regarding sit/stand requirements; accordingly, the VE reduced the positions available for final assembler jobs. (*Id.*)

Plaintiff's attorney asked the VE to address the final assembler position, and how much the availability of that job would be reduced due to the sit/stand requirement. (*Id.*)  The VE opined that jobs for the final assembler position would be reduced to 30,000 in the United States and 2,000 in Texas. (R. at 56.)

Plaintiff's attorney then asked the VE to consider a hypothetical person, similar to the ALJ's

12

description. (*Id.*)  He asked the VE to opine what impact the hypothetical person's absence approximately four times a month would have on her ability to perform the three positions identified by the VE. (*Id.*) The VE opined that this limitation would be in excess of what most employers would tolerate. (*Id.*)  The ALJ then asked the VE to assume the same question, but limiting the hypothetical person's ability to work to a total of five hours per day. (*Id.*)  The VE opined that the limitation would be in excess of what most employers would tolerate. (*Id.*)

## C.    The ALJ's Findings

The ALJ issued his decision denying benefits on February 26, 2013. (R. at 31.)  At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since the alleged onset of disability on April 26, 2011. (R. at 24.) At step two, he found that Plaintiff suffered from three severe impairments: degenerative disc disease of the lumbar spine status post surgery, status post coccyx fracture, and sacroiliac joint disorder. (*Id.*)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of impairments listed in the regulations. (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the following residual functional capacity: lift and carry ten pounds occasionally, less than ten pounds frequently; stand and/or walk about six hours in an eight hour workday and sit about six hours in an eight hour work day, but she must be able to alternative between sitting and standing, *at will*, to relive pain or discomfort. (*Id.*)  Ske could only push or pull a maximum of 20 pounds with the upper extremities. (*Id.*)  Additionally, Plaintiff could not climb ladders, ropes, or scaffolds, and only occasionally perform all other postural activities. (*Id.*)  She also could not be exposed to hazardous moving

13

machinery, excessive vibration, or unprotected heights. (*Id.*)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (R. at 30.)  At step five, the ALJ determined that the Medical-Vocational Rules supported a finding of not disabled because Plaintiff could perform other jobs existing in significant numbers in the regional and national economy, such as call out operator, document preparer, and final assembler, based on the VE's testimony. (R. at 30-31.)  Accordingly, the ALJ concluded that Plaintiff was not disabled as the term is defined under the Social Security Act from April 26, 2011, through the date of his decision on February 26, 2013.  (R. at 31.)

## II.  ANALYSIS

### A.  Legal Standards

#### 1.     Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the

14

Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.* at 436 and n.1.

### 2.   Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

15

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. (*Id.*) Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.  Issues for Review:**

Plaintiff presents three issues for review:

16

1. Did the Administrative Law Judge err by according inadequate weight to medical opinion evidence from treating physician Dr. Cravens in reaching his residual functional capacity determination?

2. Did the Administrative Law Judge err in analyzing the required factors when assessing the credibility analysis for the Plaintiff's functional limitations in determining Plaintiff's RFC?

3. Did the Administrative Law Judge err in improperly relying on Vocational Expert testimony elicited in a response to an incomplete hypothetical question in making a step five determination?

(doc. 16 at 1.)

## C. **Medical Opinion**

Plaintiff contends that the ALJ erred by according inadequate weight to medical opinion evidence from her treating physician in reaching his RFC determination. (doc. 16 at 5.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam).  The relevant policy interpretation regarding the RFC determination states:

1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v.*

*Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir.

1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).  If the evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.  "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]."  *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different

conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.   Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted)   Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision.  *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, before proceeding to step four, the ALJ determined that Plaintiff had the following RFC: lift and carry ten pounds occasionally, less than ten pounds frequently; stand and/or walk about six hours in an eight hour workday and sit about six hours in an eight hour work day, but she must be able to alternative between sitting and standing, *at will*, to relive pain or discomfort; push/or pull a maximum of 20 pounds with the upper extremities. (*Id.*)  She could not climb ladders, ropes, or scaffolds, and only occasionally perform all other postural activities. (*Id.*)  Plaintiff also could not be exposed to hazardous moving machinery, excessive vibration, or unprotected heights. (*Id.*)

In reaching his determination, the ALJ noted inconsistencies between Dr. Cravens's medical opinion evidence, the longitudinal evidence of record, and the treating source's own treatment records. (R. at 28.) The ALJ noted that Dr. Cravens submitted an RFC questionnaire that listed Plaintiff's prognosis as fair and described her symptoms as constant low back pain throughout and bilateral hip pain. (*Id.*)  Dr. Cravens's opinion stated that she could occasionally lift ten pounds or less, and never lift twenty pounds or heavier and that she could only reach with her arms and grasp,

turn, and twist objects with her hands fifty percent of the time. (*Id.*)  Dr. Cravens opined that Plaintiff would need to recline or lie down during a hypothetical eight hour working day in excess of the typical 15 minute break in the morning, the 30-60 minute lunch, and 15 minute break in the afternoon; Plaintiff could not walk a city block without rest or significant pain; Plaintiff could only sit, stand, and walk for 15 minutes at a one time and could sit for a total of three hours in an eight hour workday and stand for a total of two hours in an eight hour workday. (*Id.*)  Dr. Cravens further opined that Plaintiff needed to be able to alternate between sitting and standing at will and to take unscheduled breaks every one to two hours for between 15-20 minutes at a time. (*Id.*) Additionally, she could occasionally lift 10 pounds or less, but never 20 pounds or more, and only reach with her arms and grasp, turn, and twist object with her hands 50 percent of the time. (*Id.*)  Based on these impairments, Dr. Cravens specified that Plaintiff was physically incapable of working an eight hour day for a forty hour work week on a sustained basis. (*Id.*)

Although Dr. Cravens was Plaintiff's treating physician, the ALJ found that his report could not be given controlling weight on determining the RFC because his opinions were inconsistent with other substantial evidence on the record. *Smith*, 2014 WL 4467880, at *3. Specifically, the ALJ noted there was no medically determinable impairment established in the record that would support the manipulative limitations identified in the assessment; there was nothing to suggest Plaintiff would be restricted in her ability to reach with her arms, or grasp, turn or twist with her hands; and there was no mention of any objective findings during the examination that would support the severity of the restrictions. (R. at 28.) The ALJ further found that "Dr. Cravens' opined restrictions seem to be based primarily on the claimant's subjective complaints," rather than objective medical evidence. (*Id.*)  Accordingly, Dr. Cravens's opinion was "considered, but ultimately only given

limited weight in its entirety, though some aspects of the onions were consistent with the longitudinal treatment records." (R. at 28.) The ALJ could not find in the longitudinal record where Plaintiff had difficulty reaching with her arms, or grasping, turning, or twisting with her hands. (R. at 28.)  He concluded, "[t]here is no medically determinable impairment established in the record that would support the manipulative limitations . . . Dr. Cravens assessed." (*Id.*) In addition, the ALJ noted that the examination records for the September examination by Dr. Cravens showed that Plaintiff was neurologically intact, and she was neurologically stable in March. (*Id.*)  The ALJ concluded that Dr. Cravens's restrictions were inconsistent with the objective medical evidence regarding her ability to sit, stand, or walk.  Because he found that Dr. Craven's opinions were inconsistent with the objective medical evidence (R. at 29), the ALJ could reject them as not controlling without the need to perform a factor-by-factor analysis. *See Wilson v. Colvin*, No. 3:13–CV–1304–N, 2014 WL 1243684, at 8-9 (N.D. Tex. Mar. 26, 2014).

The ALJ also relied on and gave significant weight to the two state agency opinions as a result of his analysis and consideration of Dr. Cravens's opinions. (*Id.*)  Dr. Gupta's opinion, dated February 10, 2012, found that Plaintiff was limited to a light level of exertion with the ability to stand and/or walk of at least two hours in an eight hour workday and sit about six hours in an eight hour workday, but with the ability to periodically alternate sitting and standing to relieve pain or discomfort. (*Id.*)  Dr. Gupta further opined that Plaintiff could never climb ladders, ropes, and scaffolds, but could occasionally perform all other postural activities. (R. at 28-29.)  He identified no other limitations in the remaining categories. (R. at 29.)  The ALJ next considered the opinion of the second state agency expert, Dr. Blando, which was dated June 7, 2012. (*Id.*)  Dr. Blando opined that Plaintiff was limited to light work, that she could stand and/or walk about six hours in

an eight-hour day, and that she was occasionally limited in postural activities, with no other restrictions assessed in the remaining categories. (*Id*.) Dr. Blando reported that there was no established medically determinable impairment to support Dr. Cravens's manipulative limitations, and that there was no bilateral hip pain mentioned in the last physical therapy visit. (*Id*.)   The ALJ found that the opinions of Dr. Gupta and Dr. Blando were "generally consistent with the longitudinal evidence of record and are given significant weight." (*Id*.)

The ALJ found that Dr. Cravens's treating source opinions did not deserve controlling weight regarding Plaintiff's limitations because other substantial evidence supported a contrary medical conclusion counter to his medical opinions. *Bradley,* 809 F.2d at 1057.   In making this assessment, the ALJ acknowledged that he was Plaintiff's treating neurosurgeon, thereby addressing his examining and treatment relationship with her as well as his relevant specialization to her physical limitations. *See*   20 C.F.R. § 404.1527(c)(1), (2), (5).   Substantial evidence properly supports the ALJ's appropriate evaluation of Dr. Cravens's treating source opinions.

Plaintiff contends that the ALJ afforded little weight to the remainder of the limitations Dr. Cravens found concerning her ability to lift and change position between sitting and standing because he found them to be inconsistent with the medical evidence. (*Id*.)   She claims that Dr. Cravens's medical opinions are clearly supported by his specialty in neurosurgery and the length of his treating relationship with her (approximately ten months at the time the ALJ rendered his judgment). (*Id*.) She contends that since the ALJ acknowledged that Dr. Cravens was her treating physician, much more of his opinion should have been incorporated into the RFC because he is entitled to great, if not controlling weight.  She also contends that since the ALJ rejected some of Dr. Cravens' medical opinions and failed to incorporate much of his medical opinion in the RFC,

23

the ALJ was required to go through the *Newton* analysis.

Even though the ALJ did not give controlling weight to Dr. Cravens's medical opinions, he did not need to go through the *Newton* factors. *See* 20 C.F.R. § 404.1527(d)(2). In *Newton*, the ALJ was required to go through the six factors because he rejected the treating physician's opinion as controlling. *Newton*, 209 F.3d at 456. Because the ALJ relied on competing first-hand medical evidence in this case, he was not required to perform a full factor-by-factor analysis. *See id.* at 458. Since the ALJ afforded the appropriate weight to the treating physician's opinions, remand is not required on this issue.

### D. Credibility

Plaintiff contends that the ALJ's credibility determination was not supported by substantial evidence because he erred in analyzing the required factors. (doc. 16 at 20-22.)

Social Security Ruling: SSR 96–7p requires the ALJ to follow a two-step process for evaluating a claimant's subjective complaints. SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. (*Id.*) Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. (*Id.*) If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements. (*Id.*); *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648–49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record,

including medical signs and laboratory findings, and statements by the claimant and her treating or examining sources concerning the alleged symptoms and their effect.  SSR 96–7p, 1996 WL 374186, at *2.  The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements:

1.   the claimant's daily activities;
2.   the location, duration, frequency, and intensity of pain or other symptoms;
3.   factors that precipitate and aggravate symptoms;
4.   the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;
5.   treatment, other than medication, for relief of pain or other symptoms;
6.   measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back);
7.    and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

(*Id.* at *3.)

Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F.Supp.2d 863, 871 (E.D. Tex. 2005). Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *Falco*, 27 F.3d at 164. The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility, since he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n. 18 (5th Cir. 1994).

Here, the ALJ acknowledged that Plaintiff's medically determinable impairments could be expected to cause her alleged symptoms, but he concluded from the entire record that her testimony

25

about the intensity, persistence, and limiting effects of her symptoms was not entirely credible. (R. at 26.) After consideration of the evidence, but not in a formalistic fashion, the ALJ addressed several of the credibility factors listed in SSR 96-7p, which went towards the duration, frequency, and intensity factors. (*Id.*) He first discussed Plaintiff's contentions that her disability started on April 28, 2011, where evidence prior to that date revealed that she complained of back pain at least seven months before her disability onset date.  (*Id.*) The ALJ noted that Plaintiff underwent a myelogram of the lumbar spine on April 14, 2011, which revealed moderate degenerative space narrowing. (*Id.*) He also noted that Plaintiff underwent surgery in May 17, 2011, and that she was doing well at her post surgical follow-up on June 17, 2011. (*Id.*)

The ALJ also noted that in August 2011, Plaintiff stated her back pain was eighty percent better at her post-surgery follow-up visit. (R. at 27.) By September 13, 2011, Plaintiff showed improvement with physical therapy and had no complaints of pain. (*Id.*) The ALJ considered factors that caused an apparent aggravation after lifting something heavy. (*Id.*) He also noted that from February and March of 2011, the record indicated Plaintiff had no back abnormalities or back pain, and she had her normal range of motion. (*Id.*) The ALJ noted that she was unable to work during this time because of pain, but she was not taking any pain medications. (*Id.*) The ALJ stated that he carefully considered the entire record and concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they conflicted with the RFC assessment. (R. at 28.)

Plaintiff argues the ALJ erred in his credibility determination by placing importance on the fact that she was not taking any prescription medications, only Bayer Aspirin or Aleve, in March 2012. The ALJ noted that "[i]t is logical to assume that if she was taking prescription pain

medications, the amount of pain would not be severe." (R. at 27.)  Plaintiff, however, contends, "This is an assumption that is not only incorrect, but one the ALJ is not qualified to make." (doc. 16 at 21.) Courts have considered the use of over-the-counter pain medication to support an adverse credibility finding concerning allegations of pain. *See Parfait v. Bowen*, 803 F.2d 820, 813-14 (5th Cir. 1986) (determining that a claimant who receives conservative pain treatment substantially supports an ALJ's adverse credibility finding regarding debilitating and severe pain); *see also Villa*, 895 F.2d at 1024 (stating that the ALJ was not precluded from relying on the lack of prescribed treatment as an indication of nondisability); *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988) (recognizing "that an absence of objective factors indicating the existence of severe pain-such as limitations in the range of motion, muscular atrophy, weight loss, or impairment of general nutrition-can itself justify the ALJ's conclusion."). The ALJ must consider subjective evidence of pain, but it is within his discretion to determine the pain's disabling nature. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference.  *Carrier v. Sullivan*, 944 F.2d at 247.  Plaintiff has not shown that the ALJ erred by relying on the fact that she took over-the-counter pain medication in making an adverse credibility determination.

Plaintiff also argues that the ALJ erred when he referenced that Plaintiff "did not report apparent strain after lifting something heavy about 150 pounds the day before," and by failing to consider testimony regarding Plaintiff's limitations. (doc. 16 at 21; R. at 28.) As noted in Plaintiff's own testimony, she was able to block a 150 pound shed from falling on her and proceeded to run from the accident. (R. at 52.)  The ALJ noted that the objective record, along with State agency medical consultants, contradicted identified limitations in her daily activities that were used to show

27

she was disabled. (*See* R. at 29.) Although the ALJ considered Plaintiff's testimony regarding pain, he determined that a finding that she was able to lift and carry 10 pounds occasionally and less than 10 pounds frequently was consistent with the objective medical record and her testimony about occasional cooking and laundry. (*Id.*) As previously noted, the ALJ could and did rely on Plaintiff's testimony and other medical evidence to make his credibility determination.

The ALJ's discussion shows that he relied primarily on the medical evidence of record to find Plaintiff not credible. Although not in a formalistic fashion, he also considered the factors for determining credibility and adequately explained his reasons for rejecting Plaintiff's subjective complaints, and there is substantial evidence to support his determination. *See Falco*, 27 F.3d at 164. Therefore, remand is not required on this issue.

### E.  Hypothetical Question

Plaintiff argues that substantial evidence does not support the ALJ's step five determination, because the ALJ erred in relying on VE testimony elicited in response to an incomplete hypothetical question. (doc. 16 at 22-23.)

To be considered disabled, a claimant must have a severe impairment that makes him unable to perform his previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [his] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. 20 C.F.R. § 404.1520(a)(4)(I); *Greenspan*, 38 F.3d at 236. Once the

Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

To establish that work exists for a claimant at step five of the sequential disability determination process, the ALJ relies on the testimony of a VE in response to a hypothetical question[3] or other similar evidence, or on the Medical-Vocational Guidelines promulgated to guide this determination, often referred to as "the Grids." *Newton,* 209 F.3d 458; *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling*, 36 F.3d at 436; *see also Hernandez v. Astrue*, 269 F. App'x 511, 515 (5th Cir. 2008) (citing *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002)). A claimant's failure to point out deficiencies in a hypothetical question does not, however, "automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). The ALJ's failure to reasonably incorporate a claimant's disability into his or her hypothetical questions may render those questions defective if the disability severely limits the claimant's job prospects. *See Bridges v. Comm'r of Soc. Sec. Admin.*, 278 F. Supp. 2d 797, 806–07 (N.D. Tex. 2003). If, in making a disability determination, the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden of proof to show that a claimant could perform available work despite an impairment. *Boyd*, 239 F.3d at 708.

---

[3] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)).

Here, the ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, experience, and RFC could perform her past relevant work. (R. at 54.) The VE responded that she could not. (*Id.*)  On further questioning, the VE opined that such an individual could perform the jobs of a callout operator, document preparer, or final assembler. (R. at 55.)  The VE also testified about the availability of the jobs, the conformity of his testimony with the DOT, and how his reduction in available jobs was based on Plaintiff's RFC limitations that were not considered in the DOT. (*Id.*)  The ALJ concluded that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the state and national economy. (R. at 31.) Furthermore, the ALJ stated that under this framework of rules, a finding of "not disabled" was appropriate for Plaintiff. (*Id.*)

Plaintiff contends that the ALJ's hypothetical was "incomplete" because she disagrees with the ALJ's RFC determination. (doc. 16 at 22-23.)  The hypothetical question posed by the ALJ to the VE reflected the limitations stated in the ALJ's RFC assessment and the ALJ's credibility analysis. *See Morris v. Bowen*, 864 F.2d 333,336 (5th Cir. 1988).  Additionally, the question was consistent with the evidence of record.  Accordingly, the ALJ did not need to include anything further in the question. *See id.*  Remand is not required on this issue.

### III. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on this 25th day of September, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE